**IN THE COURT OF APPEALS OF IOWA**

No. 13-1079
Filed May 14, 2014


IN RE THE MARRIAGE OF MICHAELLE SUE FLINN
AND WILLIAM JOHN FLINN

Upon the Petition of
MICHAELLE SUE FLINN,
        Petitioner-Appellant/Cross-Appellee,

And Concerning
WILLIAM JOHN FLINN,
        Respondent-Appellee/Cross-Appellant.
_____


        Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg,

Judge.


        Michaelle Flinn appeals and William Flinn cross-appeals from various

provisions of the dissolution decree.  **AFFIRMED AS MODIFIED.**


        Elizabeth Kellner-Nelson of Kellner-Nelson Law Firm, P.C., West Des

Moines, for appellant.

        Catherine C. Dietz-Kilen of Harrison & Dietz-Kilen, P.L.C., Des Moines, for

appellee.


        Considered by Potterfield, P.J., and Doyle and Bower, JJ.

**POTTERFIELD, P.J.**

Michaelle Flinn appeals the visitation and property distribution provisions of the dissolution decree. On cross-appeal, William Flinn challenges the award of eighteen months of rehabilitative alimony and the requirement that he be responsible for all transportation related to visitation. We conclude the decree is equitable as to the property distribution, visitation, and support. We, however, modify the decree to the extent that Michaelle shall be responsible for transporting the child to and from William's residence for weekend visits. We affirm as modified.

*I. Scope and standard of review.* We review this equity action de novo. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). In doing so, we review the entire record and adjudicate the issues anew. *Id.* Although we give deference to the district court's findings—particularly with regard to witness credibility—we are not bound by them. *Id.* We disturb the district court's ruling only when there has been a failure to do equity. *Id.*

*II. Background facts.* We adopt the following findings of fact made by the district court.

> [Michaelle] and [William] were married in Jamaica on February 26, 2007. The Petitioner, Michaelle Sue Flinn, was born on January 2, 1984, and at the time of the hearing in this matter was twenty-nine years of age and in good health. The Respondent, William John, was born on May 24, 1983, and was also in good health at the time of trial in this matter. [Michaelle] and [William] have one child from this marriage, [A.F.], who was born on January 4, 2008. In addition, [Michaelle] has another child . . ., age nine, from her prior marriage to Mr. Lukas Kane. . . . [Michaelle] and [William] reside approximately four miles from each other.
> At the time of the trial in this matter [Michaelle] was pursuing a two-year degree in human services having previously completed a CNA course. She graduated from high school in 2002 and is a

full-time student at Des Moines Area Community College. Her plans are to achieve her bachelor's degree after completing courses at Des Moines Area Community College from Grand View College, also in Des Moines, Iowa. She will then do an unpaid internship with Juvenile Court Services in Des Moines, Iowa.

. . . .

[William] is also a high school graduate and a member of the military. He enlisted in the military while he was in high school and upon graduation from high school went to military training and then to active duty. He was on active duty for approximately four years and then returned to be a part of the Air National Guard stationed in Iowa for two to three years. In 2005 [William] was activated and stationed numerous places including Qatar, Turkey, England, Florida, the Pentagon in Washington, DC, and also in San Francisco. [William] was a military police and personal security member of the armed services.

[Michaelle] and [William] met when [William] was not on active duty. He was, however, still a member of the National Guard as security forces. [William] reenlisted into the service for another six years after his initial enlistment was up and now will have to make a decision on whether to re-enlist in June 2013 when his six-year enlistment expires. At the present time his status as nonactive military requires that he perform weekend duty at least once a month.

. . . .

When [William] is not in the military or on active duty he is employed at the Polk County Jail in Polk County, Iowa. His work schedule is [currently] Friday through Tuesday, 7:30 a.m. to 4:00 p.m. His job duties include supervising inmates at the Polk County Jail. [William]'s salary is $63,798.77 per year. When [William] is on active duty, Polk County Jail supervisors have been very accommodating for his military service. [William] has also earned a significant amount of additional income when he is on active military duty.

[Michaelle] was previously married to Mr. Lukas Kane and was divorced in approximately 2005. She then met [William] in 2005 or 2006 and they were eventually married. Originally, they moved into her home while trying to sell [William]'s house that he owned prior to their marriage. However, these plans changed, and [Michaelle] quit claim deeded her home to her former husband, Lukas Kane, and moved into [William's] residence in Elkhart, Iowa. [Michaelle] testified that she contributed to the mortgage that [William] paid for the home in Elkhart, Iowa, when they moved in together. They also had a joint bank account. Items were purchased from this joint bank account for the home as well as payments made for bills necessary for the maintenance of the home.

When [Michaelle] became pregnant with [A.F.], she worked as needed at Mercy but when [A.F.] was born took time off. She then was a stay-at-home mother for approximately one and a half years, which was agreed to between her and [William].

[Michaelle] and [William] decided that [Michaelle] should pursue school to obtain more education to improve her income. To this end, [Michaelle] took advantage of [William]'s GI Bill benefits which helped pay for post-secondary education. To do this, [William] had to transfer his benefits to [Michaelle]. These benefits then were used by [Michaelle] for her schooling.[1]

In approximately October 2011 the marriage relationship between [Michaelle] and [William] broke down to the point that [Michaelle] filed a petition for dissolution of marriage. . . .

On October 14, 2011, [Michaelle] moved out of the family residence. On December 20, 2011, an order on temporary matters was issued by the Court granting the parties joint legal custody of [A.F.] with physical care to be temporarily with [Michaelle]. The temporary order also provided for visitation between the minor child and [William] as well as child support to be paid by [William] to [Michaelle]. [William] was further ordered to continue medical coverage for and on behalf of both [Michaelle] and the parties' minor child, [A.F.] In addition, the parties were ordered to file joint federal and state income tax returns for the 2011 income tax year as married and filing jointly. The order further stated that if a refund was received, the money was to be deposited into the trust account of [Michaelle]'s attorney until it could be determined or agreed upon how a refund would be divided. The temporary order also granted [William] the marital home . . . with [William] responsible for the mortgage payments and other payments associated with that home. Further, [William] was ordered to pay back to the Department of Veterans Affairs $2337.30 which was an overpayment of military benefits; pay the Harris truck loan; the Menards credit card; the Nebraska Furniture Mart credit card; the Chase credit card; a loan from Donald Flinn; and all other debts and credit cards held solely in his name. The temporary order provided [Michaelle] was to be responsible for and make payments on the Volvo car loan; the Younkers credit card; the Gap credit card; and all other debts and credit cards held solely in her name. [Michaelle] was also entitled to the exclusive use and possession of the Volvo automobile with [William] being entitled to exclusive use and possession of the Ford Escort and the truck. Lastly, [William] was ordered to pay $5000 toward [Michaelle]'s temporary attorney fees.

---

[1] Michaelle testified she has received about $18,000 in GI benefits from the time the parties separated to the date of trial.

At present, both [children] reside with [Michaelle] and appear to be very close to each other. [A.F.], of course, has visitation with [William] and [the other child] has visitation with her father, Mr. Lukas Kane.

The evidence and testimony of family members and the facts indicate that both [Michaelle] and [William] are very loving and good parents and that [A.F.] loves and enjoys being with both [Michaelle] and [William]. [A.F.] further enjoys being with her extended family members, including several members of [William]'s family. The parties are in agreement that the primary physical care of [A.F.] should be with [Michaelle] with the parties both having joint legal custody. The parties are in disagreement as to the division of property and as to a visitation schedule between [A.F.] and [William].

The district court divided the parties' liabilities and the remaining assets on which they could not agree. The court found temporary spousal support for a limited period was warranted, noting the agreement that Michaelle forego employment and become a full-time student for a time, and the fact that William makes significantly more income than Michaelle. The court awarded liberal visitation, which—after a modification—was scheduled as follows:

Every Tuesday beginning at 4:15 p.m. and continuing until Thursday at 7:45 p.m.

Every other weekend from Friday at 4:15 p.m. and continuing until Sunday at 7:00 p.m.

[William] shall pick [A.F.] up from [Michaelle's] residence at the start of his parenting time and shall return [A.F.] to [Michaelle's] residence at the conclusion of [William's] parenting time, unless otherwise agreed upon by the parties.

*III. Visitation.* It is clear both parents love their daughter and are able to care for her. William's days off are Wednesday and Thursday and the award of midweek overnight visitation (Tuesday at 4:15 to Thursday at 7:45) allows him time with his daughter during his days off.

Michaelle complains that the midweek visitation is too disruptive to the child's schedule and deprives her of time with her sister. Michaelle's other

daughter spends every Wednesday evening with her father, and the siblings' visitations with their fathers coordinate so they spend every other weekend together. Here, each parent will have every other weekend to spend time with their daughter during her days off of school. Michaelle and William live within four miles of each other. We do not disturb the visitation scheduled, or the court's determination that William is responsible for transportation on the weekdays. We note that William is done with work at 4:00 p.m. on Tuesday and the 4:15 pick up time would appear to coincide with his homeward route. As for the drop off on Thursday evening, we note Michaelle will have her other child at home with her. However, we agree that Michaelle should be responsible for some of the transportation and modify the decree to the extent that she will be responsible for transporting A.F. to and from William's residence for weekend visits. Nothing in the decree prevents the parties from agreeing to different transportation arrangements.

*IV*. *Rehabilitative Alimony*. Alimony is not an absolute right, but depends upon the circumstances of each particular case. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486 (Iowa 2012). In determining whether to award spousal support, we consider the factors set forth by our legislature, which include the length of the marriage, the parties' age and health, the property distribution, each party's earning capacity, and the feasibility of the party seeking maintenance to become self-supporting at a standard of living comparable to that enjoyed during the marriage. Iowa Code § 598.21A(1). A trial court has considerable latitude in awarding spousal support, and we will only disturb such an award if it fails to do equity between the parties. *Schenkelberg*, 824 N.W.2d at 486.

Here, the district court observed the parties had agreed during the marriage that Michaelle would forgo her employment to care for the children, and later that she would further her education. We have considered the section 598.21A(1) (2011) factors, and in light of the parties' agreement, Michaelle's plans to complete her education soon, and William's significantly greater earning capacity, we find no failure to do equity in the award of eighteen months of rehabilitative alimony in the amount of $600 per month ($10,800).

*V. Property distribution.* "Property division and alimony should be considered together in evaluating their individual sufficiency." *In re Marriage of Trickey*, 589 N.W.2d 753, 756 (Iowa Ct. App. 1998). In matters of property distribution, we are guided by Iowa Code section 598.21. Iowa courts do not require an equal division or percentage distribution. *In re Marriage of Campbell*, 623 N.W.2d 585, 586 (Iowa Ct. App. 2001). The determining factor is what is clear and equitable in each particular circumstance. *In re Marriage of Miller*, 552 N.W.2d 460, 463 (Iowa Ct. App. 1996). The allocation of marital debt inheres in the division of property. *In re Marriage of Sullins*, 715 N.W.2d 242, 251 (Iowa 2006).

In addition to items already divided by agreement of the parties (the value of which is not in the record), William was awarded the homestead, which the court valued at $158,000. The current mortgage was $132,696. William was ordered to refinance or to sell the homestead "with the net equity to be divided with [Michaelle] receiving one-fourth and [William] receiving three-fourths of the

net equity."[2]  William was also awarded the Volvo valued at $6246 with a $5710 encumbrance[3] and the 2010 F150 valued at $29,365 with an encumbrance of $23,622.  He was also awarded the Valley Bank checking account with $2197.  He was to be responsible for credit card debts in the approximate amount of $7903.  He was also ordered to pay $7000 towards Michaelle's attorney fees ($5000 of which had been ordered previously and which the court specified Michaelle would not have to pay back).

In addition to items already divided by agreement of the parties, Michaelle was awarded the Ford Escort valued at $500; bank accounts totaling about $1000, and an elliptical exerciser purchased for $2000.  She was also awarded one-half of William's IPERS account accumulated during the marriage.  She was to be responsible for about $3125 in credit card debt.  Michaelle was ordered to return her wedding ring[4] to William, but was awarded her jewelry box and items therein, of which she was apparently already in possession.  At trial, she testified she would give William the wedding ring and that she had received about $2000 worth of jewelry.

Upon our de novo review, and considering together the distribution of assets and liabilities and the award of rehabilitative alimony, we do not find the property distribution resulted in a failure to do equity.

*VI. Appellate attorney fees.*  Both parties seek an award of appellate attorney fees.  "Appellate attorney fees are not a matter of right, but rather rest in

---

[2] Though William argued he had about $12,000 in premarital equity in the house, the district court found there was none.  We agree with the court's finding.
[3] Neither party wanted the Volvo.
[4] This was a substitute for the wedding ring—the parties' original wedding ring was replaced during the marriage because Michaelle did not like it.

this court's discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). In determining whether to award appellate attorney fees, we consider "'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *Id.* (quoting *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993)). After carefully considering each of these factors, we find neither party is entitled to an award of attorney fees in this appeal.

Costs shall be taxed one-half to each party.

**AFFIRMED AS MODIFIED.**